IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUSAN KING,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      No. 12 C 9280
                                     )
CAROLYN W. COLVIN, Acting            )      Magistrate Judge Finnegan
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan M. King seeks to overturn the final decision of the Commissioner

of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the

Social Security Act.  42 U.S.C. §§ 416, 423(d), 1381a.  The parties consented to the

jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and

filed cross-motions for summary judgment.  After careful review of the record, the Court

now grants Plaintiff's motion, denies the Commissioner's motion, and remands the case

for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on August 20, 2007 and SSI on January 31, 2008,

alleging that she became disabled on March 9, 2007.  (R. 155, 159, 161, 190).  She

claimed she was disabled due to chronic low back pain and thyroid issues.  (R. 195).

The Social Security Administration ("SSA") denied both of Plaintiffs applications on April

3, 2008, and denied them again upon reconsideration on October 23, 2008.  (R. 68-71).

Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Sherry

Thompson held an administrative hearing on December 1, 2009. (R. 28). The ALJ heard testimony from Plaintiff (who appeared without counsel), Plaintiff's boyfriend Vaughn Ragland, and vocational expert ("VE") Pamela Tucker. On April 9, 2010, about four months after the hearing, the ALJ determined that Plaintiff is capable of performing her past relevant work as a document specialist and, thus, is not disabled. (R. 72-84). The Appeals Council denied Plaintiff's request for review on July 10, 2012, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 7-10).

In support of her request for reversal and remand, Plaintiff argues that the ALJ (1) failed to consider the effects of Plaintiff's depression and gout on her limitations; (2) failed to give proper weight to the March 19, 2008 opinion of Dr. Timothy R. Lubenow and the May 13, 2008 opinion of Dr. Thomas Y. Pang, her treating physicians; and (3) made a flawed credibility determination by misconstruing Plaintiff's ability to engage in activities of daily living and her treatment history, and by giving no weight to the testimony of two third party witnesses.

## **FACTUAL BACKGROUND**

Plaintiff was born on June 22, 1966, and was 43 years old at the time of the ALJ's decision. (R. 43). She completed the twelfth grade. (R. 44). Prior to applying for DIB and SSI, Plaintiff worked as a document specialist—standing and copying documents—for about two or three years until she became the supervisor of a copy department, which position she held for over seven years. (R. 44-45, 196). On March 9, 2007, Plaintiff's chronic back pain became so severe that she fell upon getting out of bed the next day and she never again felt able to return to work. (R. 44-46).

As discussed in more detail below, Plaintiff applied for and began receiving long term disability benefits through her employer sometime around May 2007 (and also applied for DIB a few months later, in August 2007). (R. 155, 159, 161, 190, 338, 451-53). Her long term disability benefits were discontinued when she filed a worker's compensation claim sometime in mid-December 2007. (R. 451-53). Her worker's compensation claim was denied and shortly thereafter, on January 31, 2008, Plaintiff applied for SSI. (R. 190, 451-53).

**A.    Physical Health Medical History**

**1.    March 2007 through December 2007.**

On March 11, 2007, a few days after Plaintiff's last day at work, she called the Howard Brown Health Center in Chicago, Illinois ("Howard Brown") complaining about her back pain, and was told to take Valium. (R. 332). The next day, she was examined by, and discussed her pain more fully with, Dr. James Barrett, a family practitioner at Howard Brown. (R. 332). Plaintiff told Dr. Barrett that she was experiencing back pain that radiated to her mid left quadrant, as well as foot pain radiating from her left pinky toe. (*Id.*). She also said she planned to be absent from work for about three days. (R. 332). Dr. Barrett recommended that Plaintiff continue taking Valium for her pain and also referred Plaintiff to Dr. Mark Pietz, a podiatrist, to evaluate her foot pain. (*Id.).*

Two days later, on March 14, 2007, Plaintiff visited Dr. Pietz at the Chicago Foot Health Centers for an initial visit regarding her foot pain. (R. 317). Dr. Pietz removed the dead skin from a "painful hyperkeratotic lesion" on Plaintiff's left fifth toe which had developed on top of a bony outgrowth on that toe, and the skin removal slightly improved Plaintiff's pain. (*Id.*). Dr. Pietz recommended she wear comfortable shoes,

consider an injection into or possible removal of the bony outgrowth from the toe, and that she return in two weeks to discuss her foot care. (*Id.*). However, there is nothing in the record showing Plaintiff ever saw Dr. Pietz again.

Despite her earlier plan to be out of work for about three days, Plaintiff still had not returned to work as of March 19, 2007. Instead, she had a follow-up visit with Dr. Barrett that day regarding her back pain, which she said was at "about 8" on a scale of 1-10, with 10 being the worst pain. (R. 330). Dr. Barrett prescribed Tylenol with Codeine # 3 and referred Plaintiff for physical therapy. (R. 331). Plaintiff then visited AthletiCo for five physical therapy sessions, from March 22, 2007 until April 5, 2007, where she told the physical therapist her back pain resulted from lifting heavy boxes at work. (R. 503-532). She returned for a follow-up visit with Dr. Barrett on April 9, 2007 and complained that she was still in constant, acute pain and still felt unable to return to work. (R. 326). Dr. Barrett recommended Plaintiff have an MRI scan of her lumbar spine and referred her to Dr. Hillard Slavick, a neurologist and pain management specialist at Clinical Neurosciences, S.C., for a neurological examination. (R. 328, 340-43). Dr. Barrett also faxed a note to Plaintiff's work indicating she could not return until she was cleared to do so by Dr. Slavick. (R. 328).

On May 2, 2007, Plaintiff had the recommended MRI of her lumbar spine done at the Advocate Illinois Masonic Medical Center ("Advocate"). (R. 342-43). The MRI showed a mild straightening of the lumbar spine; a mild broad-based posterior disc osteophyte[1] complex at L4/5; a broad-based posterior disc osteophyte complex which

---

1   "Osteophyte" means "a bony outgrowth, usually found around a joint. It is commonly seen in degenerative joint disease." http://medical-dictionary.thefreedictionary.com/osteophyte (last visited April 24, 2014).

minimally narrowed the lateral recesses at L5-S1; and a mild loss of disc height at L5/S1; but the neural foramina[2] and central canal appeared "adequately patent" and the paraspinal soft tissues appeared "unremarkable." (*Id*.). A few days later, on May 9, 2007, Dr. Slavick reviewed Plaintiff's MRI results and conducted an initial neurological examination. (R. 340-41). Plaintiff told Dr. Slavick that she had been having low back pain for several years that had become worse in March 2007, and that three weeks of physical therapy had provided her no relief. (R. 340). Dr. Slavic confirmed that Plaintiff's MRI revealed osteophytes at L4-5 and L5-S1, with mild foraminal narrowing L5-S1.[3] (*Id*.). He also noted that Plaintiff was "slightly hunched while walking, but otherwise had intact strength, sensation, coordination and straight leg raise." (*Id*.). Based on the MRI and his examination, Dr. Slavick diagnosed Plaintiff with "bilateral lumbar radiculopathy[4] with a two-month history of sciatic radiating pain in the lower limbs, left greater than right." (*Id.).* He recommended an EMG/NCV study[5] of Plaintiff's lower limbs, discontinued her use of Tylenol with Codeine #3 and Flexeril, and prescribed Lyrica and Celebrex. (R. 341).

Plaintiff had the recommended EMG/NCV study performed at Advocate on May 21, 2007, which produced no abnormal results. (R. 339). Dr. Slavick conducted a

2 "Foramen" means "a natural opening or passage, especially one into or through a bone." http://medical-dictionary.thefreedictionary.com/foramen (last visited April 24, 2014). The plural of "foramen" is "foramina." http://medical-dictionary.thefreedictionary.com/foramina (last visited April 24, 2014).

3 Dr. Slavick also wrote that the MRI revealed foraminal narrowing at L4-5 in addition to the osteophytes, which was a (possibly typographical) error. (R. 340).

4 "Lumbar Radiculopathy" means "compression and irritation of nerve roots in the lumbar region, with resultant pain in the lower back and lower limbs." http://medical-dictionary.thefreedictionary.com/lumbar+radiculopathy (last visited April 24, 2014).

5 "EMG/NCV study" refers to "Electromyography/Nerve Conduction study." (R. 339).

follow-up examination of Plaintiff on June 5, 2007 and reviewed the results of the May 21, 2007 EMG/NCV study with her. (R. 338). He discussed that the EMG/NCV results were "normal" and that, although her MRI had showed some "spurring," she had no herniated discs. (*Id*.). Upon examination, Plaintiff had "tenderness to palpation over the right lumbosacral[6] paraspinal muscles," but was otherwise "intact." (*Id.*). Dr. Slavick revised his earlier diagnosis, now finding that there was "[n]o evidence of lumbosacral radiculopathy," and that Plaintiff's pain may instead be caused by "a malalignment of her lumbosacral spine." (*Id*.). He suggested that Plaintiff speak with Dr. Barrett about a referral for chiropractic adjustments and asked her to follow up with him in four to six weeks. (*Id*.). Plaintiff was also in the process of applying for long term disability benefits through her employer at this time, and Dr. Slavick completed a form to assist her (and Plaintiff eventually began receiving those benefits). (R. 338, 451-53).

Plaintiff received the recommended chiropractic treatments at Lifestyle Chiropractic, completing twenty-one sessions between June 16, 2007 and August 17, 2007. (R. 353-362). At the initial visit, the chiropractor filled out a checklist form entitled "Report of Radiographic Examination", checking boxes indicating that Plaintiff's cervical and lumbar spines were viewed and showed a loss of the normal anterior curve and a narrowing of weight bearing disc spaces. (R. 360). Plaintiff later told her physicians that the chiropractic treatments did not resolve her back pain. (R. 460).

While she was receiving the chiropractic treatments, Plaintiff's long term disability insurer sought a Work Capacity Evaluation ("WCE") of Plaintiff to evaluate her benefits claim, which Tekela Scott, MPT of NovaCare Rehabilitation performed on August 7,

---

6    "Lumbosacral" means "referring to the lower part of the backbone or spine." http://medical-dictionary.thefreedictionary.com/lumbosacral (last visited April 24, 2014).

2007. (R. 347-350). Upon examination, Plaintiff exhibited trouble squatting and crouching, her bilateral strength in her lower extremities was a 4/5 and she had poor transfer skills from sitting to standing, and she could stand for five minutes, but required a forward leaning rest break. (R. 348). Plaintiff was capable of sitting, kneeling, and walking, among other tasks, but she generally exhibited "very slow pacing" and complained of pain throughout the exam. (R. 349). Ms. Scott opined that Plaintiff could not perform the physical demands of her job because she had injured her low back and bilateral groin area as a result of lifting and pulling heavy items at her job. (R. 347). Ms. Scott found the results of the examination valid as supported by objective testing, and stated that Plaintiff appeared to put forth moderate effort. (R. 347, 350). After ceasing her chiropractic treatments and after her WCE, Plaintiff applied for DIB under Social Security on August 20, 2007. (R. 155, 159, 161, 190).

Plaintiff's long term disability insurer next sought an independent medical evaluation ("IME") of Plaintiff to further assess her claim. (R. 375-76). Dr. Jesse P. Butler, an orthopedic surgeon at the Illinois Bone & Joint Institute, conducted the IME on September 26, 2007. (*Id.*). Dr. Butler evaluated Plaintiff's May 2, 2007 MRI scan and found that it showed Plaintiff had "degenerative disc disease at L5-S1" with "[t]he remainder of her lumbar spine . . . essentially normal." (R. 376). Upon examination, Plaintiff demonstrated normal strength, sensation and reflexes and her straight leg raise test was negative. (*Id.*). However, she was only able to bend backwards 5 degrees and that was with pain. (*Id.*). Dr. Butler determined that Plaintiff's lifting and bending activities at work caused her to develop acute lower back pain. (*Id.*).

In late September 2007, Plaintiff started seeing a new family practitioner, Dr. Rochelle Hawkins at the D.H. Medical Group, S.C. (R. 433-35, 441). They discussed Plaintiff's chronic back pain issues and Dr. Hawkins referred Plaintiff to a pain specialist, Dr. Jonathan Wyatt. (*Id.*). On October 8, 2007, Dr. Wyatt examined Plaintiff at the Advocate Christ Medical Center, observing that she exhibited a full range of motion in her back with flexion, but also tenderness with palpation in her lower quadrants and along the lumbar paraspinal muscles with deconditioning[7] of her low back muscles. (R. 382-88, 440). He also reviewed her MRI, which he stated "reveals an osteophyte complex at the level of L5-S1 bulging posteriorly with encroachment to the lateral recesses bilaterally . . . [but with] significant role for the spinal nerves to leave the intervertebral foramina at the L5-S1 levels bilaterally." (R. 386). He also found that her "EMG report" was "normal." (*Id.*). Dr. Wyatt thought Plaintiff's pain might be related to a gynecological issue, but a later pelvic ultrasound ruled out that possibility. (R. 386, 560).

Dr. Hawkins next referred Plaintiff to Dr. David Hoffman, an orthopedic surgeon at Chicago Orthopedics & Sports Medicine, S.C. (R. 430-31). At a November 8, 2007 examination, Dr. Hoffman observed that Plaintiff had almost no ability to bend backward and exhibited low back pain during her straight leg raise test, although she was able to raise her leg to 75 degrees. (*Id.*). He also reviewed her May 2, 2007 MRI and stated that although it showed a "broad-based posterior disk osteophyte complex . . . at L5-S1 [and] to a lesser degree at L4-L5, [and] mild narrowing of the lateral recess at L5-S1," the "central canal and neural foraminal [sic] appear[ed] adequately patent." (*Id.*). He

---

7 "Deconditioning" means "a state of prolonged underuse of muscles." http://medical-dictionary.thefreedictionary.com/decondition (last visited April 24, 2014).

assessed her with chronic low back pain and fibromyalgia, gave her an injection of Depo-Medrol[8] and Lidocaine[9] into each greater trochanter[10] and recommended she again try physical therapy. (R. 431). In that regard, Dr. Hoffman referred Plaintiff to Accelerated Rehabilitation Center ("ACR"). (R. 396, 398, 417-418).

Plaintiff attended nine physical therapy sessions at ACR with Kristina Helquist, PT, DPT, between November 14, 2007 and December 20, 2007. (R. 414, 419-425). Ms. Helquist sent a December 18, 2007 progress report to Dr. Hoffman, discussing that Plaintiff's lower extremity strength was "less than 3/5 bilaterally," that she had limited ability to bend, a positive Thomas test,[11] and she had made no significant improvements in physical therapy. (R. 415-16). Dr. Hoffman's notes state that he examined Plaintiff on December 19, 2007, the day after Ms. Helquist authored her report to him, but there are no records or reports discussing his December 19, 2007 examination. (R. 429). Sometime in mid-December 2007, Plaintiff filed a worker's compensation claim resulting in the termination of her long term disability benefits; however, her worker's compensation claim was rejected. (R. 451-53).

---

8 "Depo-Medrol" is an anti-inflammatory steroid used to treat, among other issues, muscle pain and weakness. http://medical-dictionary.thefreedictionary.com/depo-medrol (last visited April 24, 2014).

9 "Lidocaine" is a "synthetic amide used as a local anesthetic." http://medical-dictionary.thefreedictionary.com/lidocaine (last visited April 24, 2014).

10 "Greater trochanter" means "bony prominence adjacent to root of neck of femur, palpable at lateral aspect of hip joint." http://medical-dictionary.thefreedictionary.com/greater+trochanter (last visited April 24, 2014).

11 A "Thomas test" is a "diagnostic assessment designed to measure the presence of a flexion contracture of the hip. The patient is placed supine and the uninvolved hip and knee are placed in maximum flexion (in a knee-to-chest position). When a flexion contracture of the opposite hip is present, the thigh will spontaneously elevate, thus indicating the amount of contracture present." http://medical-dictionary.thefreedictionary.com/Thomas+test (last visited April 24, 2014).

### 2. January 2008 through December 2008.

Plaintiff returned to Dr. Hoffman for a follow-up visit on January 3, 2008, complaining of back pain that radiated to her left hip and groin. (R. 429). Dr. Hoffman noted that Plaintiff had a "rather complicated history" and that her multiple doctors had yet to come to a "definitive diagnosis of her problem." (*Id.*). Plaintiff reported being "very tender to palpation" in the "right low back" and in the right paraspinous muscle, but Dr. Hoffman found her to have a full range of motion in the left hip, "good extension and good right and left lateral flexion," and equal and symmetrical reflexes and motor strength. (*Id.*). She was also able to forward flex to the mid-shins and her straight leg raise test was to 85 degrees bilaterally. (*Id.*). Dr. Hoffman diagnosed Plaintiff with low back pain with a "trigger point at the insertion of the left paraspinous muscle" and "chronic myofascial-type pain in the back and hip," gave her an injection of Depo-Medrol and Lidocaine in her right paraspinous muscle, and suggested she see a pain anesthesiologist. (*Id.*). It appears Plaintiff's worker's compensation attorney recommended she visit Dr. Timothy R. Lubenow, a pain anesthesiologist at the Rush Pain Center of the Rush University Medical Center ("Rush Pain Center"). (R. 471).

Dr. Lubenow performed an initial evaluation of Plaintiff at the Rush Pain Center on January 17, 2008. (R. 459-64). Plaintiff told Dr. Lubenow that she had been experiencing low back pain for about eight years that had progressively worsened until it became "severe" on March 9, 2007, causing her to fall while getting out of bed the next day. (R. 459). She stated that she had received steroid injections in the hips, physical therapy, chiropractic treatments and medication, but nothing helped her pain, leading to some past suicidal thoughts. (R. 459-60). During examination, Dr. Lubenow observed

that Plaintiff's straight leg raise test was positive on the left leg, she had trigger points for pain in the lumbar spine in the paraspinal muscles, and her lumbar spine demonstrated "30º/90º flexion, with 0º/35º extension and 10º/30º bilateral bending."  (R. 460).  Plaintiff demonstrated, though with pain, a 4-5/5 for motor strength in the right hip, knee and ankle and a 4/5 for motor strength in the left hip, ankle and knee, and displayed an antalgic, slow gait with problems with her toe and heel walk, although her lower extremities displayed intact sensation and no muscle atrophy.  (*Id.*).

Dr. Lubenow also reviewed Plaintiff's MRI, which he stated showed a "mild, broad based, posterior disk osteophyte complex at L4-L5;" a "loss of disk height and decreased signal intensity of the disk substance" and a "broad-based posterior disk osteophyte which minimally narrows the lateral recesses, left greater than right" at L5-S1, but that the "central canal and neuroforamina [sic] appear[ed] adequately patent." (R. 459)*.*  Based on his examination and review of Plaintiff's MRI and medical history, Dr. Lubenow diagnosed her with lumbar radiculopathy, myofascial pain and depression; recommended epidural steroid injections, particularly at the L5-S1 intervertebral space; prescribed Zanaflex for pain; sent Plaintiff for a psychological evaluation that same day by a pain psychologist, Dr. Patricia Merriman (whose examination is discussed in more detail, below); and referred her to AthletiCo for aquatic therapy pursuant to Dr. Merriman's recommendation.  (R. 461, 517, 520).

On January 25, 2008, Laura Daniels, PT, DPT at AthletiCo assessed Plaintiff prior to beginning the recommended aquatic therapy.   Ms. Daniels reported to Dr. Lubenow that Plaintiff was unable to "ambulate without compensations" or lift heavy objects; had strength levels of 3/5 in her left and right hips and knees; and had a "poor"

prognosis. (R. 520, 534-53). Shortly after this assessment, Plaintiff applied for SSI on January 31, 2008. (R. 155, 159, 161, 190). A few days later, on February 2, 2008, Dr. Lubenow administered an epidural steroid injection to Plaintiff that she later told him only decreased her pain for one day. (R. 465, 467). Then, at a February 12, 2008 follow-up visit with Dr. Hawkins, after Plaintiff stated that her "unabated" pain was causing her to "lose her mind," Dr. Hawkins administered a straight leg raise test to Plaintiff, which was positive, and recommended that she continue taking Zanaflex and Tylenol with Codeine #3 as needed. (R. 437).

From February 14, 2008 through February 28, 2008, Plaintiff had five aquatic therapy sessions at AthletiCo with Jamie Frost Trachtenberg, PT, DPT. (R. 537-542). Initially, Plaintiff reported less pain as a result of the sessions. (R. 537-38). However, at Plaintiff's February 26, 2008 and February 28, 2008 sessions, Plaintiff reported that her pain had returned and she had been in so much pain that she vomited in the evenings. (R. 538). Plaintiff returned to Dr. Hawkins on February 29, 2008, complaining of continued pain, which Dr. Hawkins advised her to treat with Zanaflex and Vicodin combined. (R. 436). Shortly thereafter, on March 3, 2008, Plaintiff had a second steroid injection administered by Dr. Lubenow, which provided no relief. (R. 466-67). He asked her to follow up in one to two weeks for another examination. (R. 466). Plaintiff had one final aquatic therapy session with Ms. Trachtenberg on March 18, 2008. In a report to Dr. Lubenow, Ms. Trachtenberg stated that Plaintiff still complained of severe pain and showed only mild improvement in her gait, range of motion and strength. (R. 540-42). Ms. Trachtenberg recommended Plaintiff cease

physical therapy based on Plaintiff's stated expectation that she was going to be evaluated for surgery. (*Id.*).

On March 19, 2008, Dr. Lubenow re-reviewed Plaintiff's May 2, 2007 MRI and performed another examination. Plaintiff reported that she was taking Vicodin and Zanaflex (and she asked for more of those medications); that the first epidural injection provided her only about one day of relief and the second injection provided no relief; and that she was feeling "very frustrated." (R. 467). In a "To Whom It May Concern" letter written the same day, Dr. Lubenow wrote that Plaintiff had "a history of low back pain radiating down the legs from a possible work-related injury" and that he had attempted to treat Plaintiff's pain with two epidural steroid injections, but she had "no significant improvement in her pain." (R. 470). He also wrote that Plaintiff's May 2, 2007 MRI showed "a broad-based, posterior, disk osteophyte complex at L5-S1 with mild, lateral recess stenosis at L5-S1" and he was sending her to Dr. Jonathan O'Toole for surgical evaluation. (*Id.*). He concluded by writing that "[a]t the present time, [Plaintiff] is incapable of work." (*Id.*). A few days later, on March 24, 2008, Dr. Lubenow administered a third epidural steroid injection to Plaintiff; noted that her pain had not abated which had made Plaintiff very emotional; prescribed her the antidepressant Lexapro;[12.] and asked her to follow up in a few weeks. (R. 468).

On March 28, 2008, Dr. Richard Bilinsky, a state agency reviewer, completed a physical residual functional capacity assessment of Plaintiff on behalf of the Bureau of Disability Determination Services ("BDDS"). (R. 571-78). Based on his review, Dr. Bilinsky opined that Plaintiff could occasionally lift or carry a maximum of 20 pounds,

---

12 "Lexapro" is a "trademark for the drug escitalopram oxalate," a "selective serotonin reuptake inhibitor." http://medical-dictionary.thefreedictionary.com/lexapro (last visited April 24, 2014).

and frequently lift or carry a maximum of 10 pounds; stand, walk or sit, with normal breaks, for about six hours in an eight hour workday; and push or pull using her upper or lower extremities to an unlimited extent. (R. 572*).* Plaintiff had no postural limitations, manipulative limitations, visual limitations, communicative limitations or environmental limitations. (R. 573-75). In support of his conclusions, Dr. Bilinsky quoted findings from Dr. Hoffman's November 8, 2007 and January 3, 2008 reports, including that Plaintiff had the full range of movement in her left hip; flexed to the mid-shins; had good extension and good right and left lateral flexion; her motor strength was bilaterally equal and symmetrical; and her straight leg raise test was to 85 degrees bilaterally and symmetrically. (R. 572, 578). A few days after Dr. Bilinsky's report, on April 3, 2008, the SSA denied Plaintiff's applications for DBI and SSI. (R. 68-71).

According to notes made by Ms. Trachtenberg at AthletiCo and records from Dr. Thomas Y. Pang, a physical medicine and rehabilitation specialist at Rehab Associates of Chicago, S.C., Plaintiff had a surgical evaluation appointment with Dr. O'Toole, a neurosurgeon, on April 9, 2008. Dr. O'Toole apparently determined that Plaintiff was not a candidate for surgery, so Dr. Lubenow referred her to Dr. Pang. (R. 470, 540, 598-99). However, there are no notes or reports from Dr. O'Toole himself, or from the consultation where Dr. Lubenow referred Plaintiff to Dr. Pang, in the record; the next chronological records are from Plaintiff's initial evaluation by Dr. Pang.

Dr. Pang interviewed Plaintiff, reviewed her medical records, and performed an initial examination of her on May 13, 2008, after which he prepared a new patient evaluation report. (R. 598-602). Plaintiff explained to Dr. Pang her medical history, work history, and "tearful[ly]" reported that she did not cook, clean or shop" and

engaged in "barely any activity at home." (R. 598-99). She also stated that her various medications—which at the time included Zanaflex, Relafen,[13] naproxen[14] and hydrocodone,[15] as well as Lexapro for depression—were not helping with her pain, and that her pain caused her trouble sleeping, difficulty with all mobility and an inability to work since March 2007. (*Id.*). During his examination, Dr. Pang observed that Plaintiff was "mildly tearful" when changing positions, including from sitting to standing and when lying down, and she was "sweating profusely" but was also "fully participatory." (R. 600). She could not stand upright, but was instead forward flexed at the hip and leaned on the exam table, and although she showed the strength to walk, including with tandem gait and on her toes and heels, she was guarded while walking and bent at the waist. (*Id.*). While testing Plaintiff's capabilities, Dr. Pang observed that her cervical spine and upper extremities were functional and she could flex forward to ninety degrees of hip flexion, but she had difficulty going back upright and was in pain when trying to back bend (which she could only do to 10 degrees), side bend or rotate. (*Id.*). Plaintiff's straight leg raise test was negative while sitting, but she had trouble extending her legs out, was significantly guarded, and had a positive Thomas test for exacerbating lower back pain. (*Id.*).

---

13 "Relafen" is a "nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis and rheumatoid arthritis." http://medical-dictionary.thefreedictionary.com/Relafen (last visited April 24, 2014).

14 "Naproxen" is a "drug used to reduce inflammation and pain, especially in the treatment of arthritis." http://medical-dictionary.thefreedictionary.com/Naproxen (last visited April 24, 2014).

15 "Hydrocodone" is "a semisynthetic opioid analgesic similar to but more active than codeine; used as the bitartrate salt or polistirex complex as an analgesic and antitussive." http://medical-dictionary.thefreedictionary.com/hydrocodone (last visited April 24, 2014).

Dr. Pang assessed Plaintiff as significantly guarded with mobility due to pain in various muscles and tissues, but without any clinical evidence of spinal stenosis[16] or radiculopathy, which he stated was consistent with the medical records and imaging study he reviewed.  (R. 601).  He wrote that Plaintiff's condition required "aggressive[]" management through medications, eventual "trigger point injections" and then "physical therapies" and proposed spending the next six months "get[ting] a hold of her current pain status" and gradually "upgrad[ing] her functional status" so that she could be "independent for all activities at the home and community level, including work."  (R. 601).  Dr. Pang recommended Plaintiff stop taking Lexapro (although he does not state whether he recommended she cease taking any other medications) and that she start taking Cymbalta,[17] baclofen (a muscle relaxant),[18] Elavil for sleep, and Neurontin (which is used to treat, among other issues, nerve pain),[19] and OxyContin.  (R. 601).  He planned for Plaintiff to take her medications for a few weeks and then return for injections into any pain trigger points as well as increasing her amount of OxyContin, if necessary, and later planned to give additional injections (including possibly Botox injections) and prescribe physical therapy.  (*Id.*).  After writing his report, Dr. Pang wrote in his prescription note pad that Plaintiff "is Temporarily [sic] on full disability and cannot

---

16  "Spinal stenosis" means "any narrowing of the spinal canal that causes compression of the spinal nerve cord."    http://medical-dictionary.thefreedictionary.com/Cervical+spinal+stenosis (last visited April 24, 2014).

17  Cymbalta is a "trademark name for duloxetine," an antidepressant.    http://medical-dictionary.thefreedictionary.com/cymbalta (last visited April 24, 2014).

18  http://www.rxlist.com/baclofen-drug.htm (last visited April 24, 2014).

19  http://www.medicinenet.com/gabapentin-oral/article.htm (last visited April 24, 2014).

work [due to] myofascial pain syndrome ~~and~~ [sic] is undergoing medical, physical and rehabilitative treatments x [sic] 6 months with goal of return [sic] to work." (R. 580).

There is no evidence in the record that Plaintiff returned for additional treatments or consultations with Dr. Pang; he had noted in his initial evaluation that Plaintiff still had "insurance issues," including problems with her worker's compensation claim, at that time. (R. 598). Plaintiff's next records are from several months later, when she visited the emergency room at the John H. Stroger, Jr. Hospital ("Stroger") on August 13, 2008, complaining of pain in her left toe. (R. 651-55, 657). Dr. Rita Agarwala, the emergency room physician, noted that Plaintiff had soft tissue swelling on her first left toe and prescribed ibuprofen, noting that Plaintiff was already taking five medications prescribed by Dr. Pang, which included pain medications. (R. 652-54). Dr. Agarwala also noted Plaintiff had no history of gout, but Plaintiff reported that she had gone to Jackson Park Hospital and was told by their staff she may have gout (no records from Jackson Park Hospital are in the record), so Dr. Agarwala gave Plaintiff patient education materials about arthritis and gout. (R. 654, 609-10). Plaintiff returned to the emergency room at Stroger a few weeks later, on September 3, 2008, complaining of shooting and stinging pain in her right foot as well as back pain. (R. 606). The emergency room doctor noted no abnormal examination results, but (apparently based on her medical history) opined that Plaintiff had radiculopathy causing her back pain, that her nerves were causing the back pain to radiate to her foot, and recommended she have a neurological consultation. (*Id.*).

On September 30, 2008, Dr. Solfia Saulog, another state agency reviewer, reconsidered Dr. Bilinsky's March 28, 2008 assessment for BDDS. (R. 646-48). Dr.

Saulog updated Plaintiff's alleged conditions to chronic low back pain, thyroid, gout and depression and wrote that Plaintiff had a new physical examination since Dr. Bilinsky's review by Dr. Pang. (R. 647-48). Dr. Saulog noted that although Plaintiff was in pain during Dr. Pang's examination, he found she was neurologically intact, able to walk and able to flex forward and had a functional cervical spine and upper extremities, and Dr. Saulog ultimately affirmed Dr. Bilinsky's assessment that Plaintiff was capable of light work. (*Id.*). A few days later, on October 3, 2008, Plaintiff visited a neurosurgery clinic at Stroger for a neurological consultation, where she described having severe back pain, muscle pain and movement limitations, was diagnosed with fibromyalgia and told to seek treatment at a "multidisciplinary pain clinic." (R. 656). However, there is no evidence in the record that Plaintiff received any more treatment, including treatment at any pain clinic, for the rest of that year, other than certain mental health evaluations for BDDS, discussed further below. A few weeks after her consultation at Stroger, on October 23, 2008, upon reconsideration, the SSA affirmed its denial of Plaintiff's applications for DIB and SSI. (R. 68-71).

### 3. January 2009 through December 2009.

On January 23, 2009, Dr. Michael R. Zindrick, an orthopedic and spinal surgeon at Hinsdale Orthopedic Associates, S.C. ("Hinsdale") performed an IME of Plaintiff related to the continuing dispute regarding her worker's compensation claim. (R. 706-708). Some pages of Dr. Zindrick's January 23, 2009 report are missing, but other pages of his notes show that after examining Plaintiff and reviewing her medical records, including her May 2, 2007 MRI and May 21, 2007 EMG/NCV study, he concluded that she had chronic, work-related pain. (R. 709). Several months later, on

May 1, 2009, Plaintiff visited an emergency room complaining of "acute back pain" and was given Naprosyn.[20]  (R. 698, 736-37).  A few weeks later, on May 25, 2009, Plaintiff visited Aunt Martha's Healthcare Network ("Aunt Martha's") regarding her back pain. She was given Diclofenac[21] and referred to Stroger to get spine x-rays, further discussed below.  (R. 691-92).  Plaintiff had medications refilled at Aunt Martha's on June 1, 2009 and July 3, 2009, but she later reported to Dr. Zindrick at an IME on September 4, 2009 that the medications did not help her pain.  (R. 689-90, 709).

On July 7, 2009, Plaintiff began seeing a new family practitioner, Dr. H. Assadi at the Madison Family Medical Center ("Madison"), to whom she complained that her back pain was now accompanied by numbness and tingling in her legs to her knees.  (R. 681-85).  Dr. Assadi diagnosed Plaintiff with chronic back pain and fibromyalgia and referred her to a pain clinic at Mount Sinai Hospital ("Sinai"), which she visited the next day for blood tests, although the record contains no analysis of her blood test results or other notes from Sinai.  (R. 684, 686-87).  Plaintiff returned for a follow-up visit at Madison on August 6, 2009 complaining of continued pain, and was again referred to Sinai.  (R. 680, 685, 709).  Although Plaintiff indicated that she planned to return to Sinai, the record contains no information about any second visit there.  About a month later, on September 4, 2009, Dr. Zindrick performed another IME of Plaintiff related to her worker's compensation claim, during which Plaintiff explained she now felt more pain in her legs than before; her legs were weak; her left foot felt numb and tingled; and her pain was generally worse.  (R 709-10).  Dr. Zindrick observed that Plaintiff walked

---

20  Naprosyn is a trademark name for naproxen.  (R. 698).

21  "Diclofenac" is "a nonsteroidal anti-inflammatory drug (trade name Voltaren) that is administered only orally."  http://www.thefreedictionary.com/diclofenac+sodium (last visited April 24, 2014).

"in a markedly antalgic fashion," that she had pain with flexion beyond 30 degrees, with extension beyond 10 degrees and with side bending to 20 degrees bilaterally, and that her straight leg raise test was positive at 60 degrees for back pain.  (R. 709).  However, he also found she had a full range of hip motion, intact sensation and reflexes, including in the ankles, no muscle wasting and no weakness in various foot, leg, hip and thigh muscles that he checked.  (*Id.*).  He stated that, overall, his opinions had not changed since his initial IME:  he still diagnosed her with degenerative disk disease and chronic back pain aggravated by a work injury; she still needed to go to work conditioning with a Functional Capacity Evaluation; and if her symptoms did not improve from work conditioning, she needed a repeat MRI scan and further evaluation.  (R. 709-10).  He also noted Plaintiff planned to seek treatment for her pain at Stroger (and Sinai, although the record contains no information about any later visits to Sinai).  (R. 709).

On September 16, 2009, Plaintiff returned to the neurosurgery clinic at Stroger, complaining of chronic back pain that radiated to her left big toe, occasional numbness on her left side and leg weakness.  (R. 721).  Because the neurosurgeon[22] at Stroger thought the "mild" results of her May 2, 2007 MRI did not explain her complaints of pain, the neurosurgeon recommended Plaintiff get an updated MRI to determine the source of her pain (but there is no evidence in the record that Plaintiff obtained any MRI after this consultation).  (*Id.*).  A couple of weeks later, on October 2, 2009, Plaintiff visited the radiological diagnostics department at Stroger for lumbosacral spine and cervical spine x-rays, which showed mild to moderate narrowing of the L5-S1 disc space with

---

22  The neurosurgeon's signature is illegible and as a result the Court cannot discern his or her name.

vacuum phenomenon,[23] "very small anterior osteophytes" in her lumbosacral spine and straightening of the cervical spine with mild degenerative disc disease. (R. 719-20). A few days later, on October 7, 2009, Dr. Zindrick completed another IME report related to Plaintiff's worker's compensation dispute, in which he discussed Plaintiff's May 2, 2007 MRI. (R. 711). He stated that although it was not "pristine or normal" due to it showing "a broad-based disk osteophyte complex . . . at L5-S1 and to a lesser degree at L4-L5 [and] mild narrowing of the lateral recess at L5-S1, . . . [th]e central canal and neural foramen appear adequately patent." (*Id.*). As a result, he continued to recommend Plaintiff be entered into a work conditioning program and undergo a Functional Capacity Evaluation, after which she potentially could be returned to work. (*Id.*) There are no further treatment records for the rest of 2009. On December 1, 2009, the ALJ held an administrative hearing Plaintiff's claim. (R. 28).

### 4. January 2010 through December 2010.

About five weeks after the administrative hearing, on January 8, 2010, Plaintiff visited the neurosurgery clinic at Stroger again and complained of low back pain, leg pain and leg weakness, and increased pain while lying down. (R. 751-54). She exhibited a positive straight leg raise test and difficulty with heel and toe walking, and was referred for physical therapy and to a pain clinic. (*Id.*). There are no further notes or reports of treatment in the record, including any notes or reports regarding physical therapy or pain clinic treatments (*Id.*). A few months later, on April 9, 2010, the ALJ found that Plaintiff was not disabled, and on July 10, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 7-10, 72-84).

---

23 "Vacuum phenomenon" means "A linear or oval radiolucency that corresponds to gas in the intervertebral space, most often seen in degenerative disk disease." http://medical-dictionary.thefreedictionary.com/Vacuum+Phenomenon (last visited April 24, 2014).

**B.     Mental Health Medical History**

The record contains three reports from clinical psychologists regarding Plaintiff's mental health evaluations.  First, on January 17, 2008, Dr. Lubenow referred Plaintiff to Dr. Patricia Merriman, a clinical psychologist of the Rush Pain Center, for a psychological evaluation and pain management counseling because Plaintiff told him her pain had caused her to have suicidal thoughts.  (R. 450, 460).   After examining Plaintiff, Dr. Merriman diagnosed her with an adjustment disorder with depressed features and assigned Plaintiff a GAF score of 55.[24]   (R. 453).   She observed that Plaintiff exhibited low energy, significant social withdrawal and irritability, and was dysphoric with a restricted emotional affect.  (R. 451-53).  Plaintiff relied on avoidance and distraction to manage her pain, showing limited insight into the psychological and behavioral issues associated with her pain disorder, and admitted to past suicidal thoughts.  (*Id.*).  Nevertheless, Plaintiff was alert, cooperative and fully oriented; she showed no signs of significant cognitive impairment or any disorganized thought processes; her memory, concentration and judgment appeared intact; and she expressed being "strongly motivated to return to work."  (*Id.*).   Dr. Merriman recommended pain management counseling to help Plaintiff manage her pain and increase her activity levels, and also recommended aquatic therapy.   (R. 453).  According to the record, Plaintiff engaged in aquatic therapy, but there is no evidence Plaintiff received any pain management counseling.

---

24 GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev.2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  *Id.*

On October 9, 2008, Dr. Gregory C. Rudolph conducted a mental status evaluation of Plaintiff for the BDDS. (R. 673). Plaintiff told Dr. Rudolph that she took Cymbalta to manage her depression; that she was able to take care of her basic needs, including dressing, grooming and personal hygiene, cooking on the stove and using the microwave; that she could drive, but only for short distances; that she needed someone to accompany her while she shopped; that she had trouble sleeping; and that she could not do household chores such as laundry or cleaning because of her back problems. (R. 675). Dr. Rudolph observed that Plaintiff's mood level was "depressed" and "somber" and that she had some vegetative symptoms, but found that her reasoning skills and memory were good and she was capable of attending to her own financial resources and basic needs. (R. 673-75). Dr. Rudolph diagnosed Plaintiff with "depression, mild to moderate, secondary to medical condition." (R. 675).

On October 16, 2008, Dr. Kirk Boyenga, a state agency consultant, performed a psychiatric review of Plaintiff's records and conducted a telephone interview of Plaintiff for BDDS. (R. 659-672). Dr. Boyenga observed that Plaintiff complained of pain several times during the interview, that she groaned, and that her self-care and ability to drive alone were limited by pain, but she was able to shop, clean, cook, do laundry and pay bills. (R. 671). He diagnosed her with depression secondary to a physical illness; found that her limitations in activities of daily living and in maintaining social functioning, concentration, persistence or pace were all mild; and found that she had no periods of decompensation of extended duration. (R.669, 671).

**C.    Testimonial Evidence and Reports**

**1.    Plaintiff's Function Report and Testimony**

In a September 17, 2008 Function Report, Plaintiff stated that she sometimes cooks or her son cooks for her; walks alone two to three days a week; grocery shops once a month at up to five different stores over a 4 to 6 hour period; carries certain light groceries such as tissues, bread, eggs and cereal; does laundry once a month "for and with" the help of her son; occasionally uses a cane for support; and does light cleaning such as dishes, dusting and ironing while sitting.  (R. 248-51, 255, 257).  Plaintiff stated that she also engages in hobbies every day—including listening to music, singing, reading and watching television—although she has trouble enjoying these activities due to her pain.  (R. 252-53, 255).  She also spends times with friends and family when they visit or talks with them by phone, but she has "problems" with them due to her depression.  (R. 252-53, 255).  Plaintiff stated that her condition limits her to standing for 20-25 minutes and sitting for 15-20 minutes at a time before experiencing pain; she can walk for 5-10 minutes before needing to rest; and she requires assistance when walking up and down stairs because it is difficult for her.  (R. 249, 253-55, 258).

At the December 1, 2009 hearing before the ALJ, Plaintiff testified that she has not been able to work since March 9, 2007 due to daily pain in her back and lower extremities that worsens when she overexerts herself.  (R. 46-49).  She testified that she lived at various times with various family members, and was then staying with her son at a sister's house.  (R. 43, 54).  She testified that she has been through various forms of treatments—including physical therapy, aquatic therapy and injections—none of which provided relief for her pain. (R. 47-50).    She has also taken various

medications that did not help her conditions, did help but were too expensive to continue, or caused painful side effects, such as constipation, tiredness, dizziness and nausea (including her medications Cymbalta, Gabapentin, Elavil and Oxycontin). (*Id.*). On her daily activities, Plaintiff testified that she requires a seat while showering; cooks quick meals on the stove or in the microwave or others cook for her; does grocery shopping with help and sometimes uses an electronic wheelchair; and can do any household chore but it can take her "a long time to do it" because she often stops and rests for periods while doing the chores. (R. 52-54). Regarding her general capabilities, Plaintiff testified that she can walk for up to 10-15 minutes; stand for 20-25 minutes if supported; sit for up to 30 minutes; and can lift an item from a table that weights 4 or 5 pounds, such as a bag of sugar or a gallon of milk. (R. 50-52). When questioned about her mental health and depression, she said she tries not to be depressed; had one therapy session with Dr. Merriman but no other therapy; and was taking Cymbalta, which was effective but too expensive to continue. (R. 55).

**2.    Plaintiff's Witnesses' Testimonies and Reports**

Jade Ball, Plaintiff's friend of two and a half years, provided a Third Party Function Report to BDDS on October 3, 2008. (R. 262). Ms. Ball reported that Plaintiff's pain causes her problems with getting dressed, using the bathroom, lifting, reaching, talking, stair-climbing, squatting, walking, bending, sitting, completing tasks, standing, kneeling, concentrating and getting along with others. (R. 263, 266-68). To further elucidate, Ms. Ball explained that Plaintiff occasionally uses a cane; cries a lot; cannot handle stress; cannot do the activities she was previously able to do; takes time and requires help to do chores, which she does in intervals; only leaves the home for

chores or errands; can only cook quick meals; and has trouble sleeping because "[s]he is in too much pain."  (R. 263-64, 266-68).

Mr. Vaughn Ragland, Plaintiff's boyfriend of more than five years, testified as a witness at the hearing.  (R. 56).  He said that Plaintiff constantly complains of pain; she is usually in pain in the mornings and after sitting for long periods of time; and she has days where her pain is "okay, I guess, through medication or whatever" but other days where "she just doesn't want to do anything."  (R. 57-58).  Regarding Plaintiff's capabilities, he stated that she can sit for about 30 minutes to 1 hour before having to stand and move; she can take short walks around the mall; she used to be active, take longer walks and be friendly, but now she is less active and lies down for hours at a time; and she has gained weight.  (R. 57-59).

### 3.    Vocational Expert Testimony

Pamela Tucker testified at the hearing as a vocational expert ("VE").  Ms. Tucker classified Plaintiff's past work in the document specialist position as sedentary and unskilled, but light as performed by Plaintiff due to the amount of standing involved.  (R. 61, 64).  The ALJ asked Ms. Tucker to consider a hypothetical person of Plaintiff's age, education level and work experience who can:  perform light work; occasionally climb ladders, stairs, ropes and scaffolds; and occasionally stoop, kneel, crouch and crawl.  (R. 61).  The VE testified that such a person could perform Plaintiff's past work as a document specialist.  (R. 61-62).  If the same person was limited to sedentary work, the VE testified that she could still perform Plaintiff's past work as a document specialist as described in the Dictionary of Occupational Titles, but not as Plaintiff performed it.  (R. 62).

**D.    The ALJ's Decision**

The ALJ found that Plaintiff's degenerative disc disease and gout were severe impairments, but that neither of these impairments met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 77-79).  Plaintiff's depression was not a severe impairment because it did not cause more than minimal limitations on her ability to perform basic mental work activities, and caused only mild limitations in her daily living, social functioning and ability to maintain concentration, persistence or pace.  (R. 77-78).  Plaintiff's degenerative disc disease and chronic back pain limited her to light work, except that she can only occasionally climb ramps and stairs, and should never climb ladders, ropes or scaffolds.  (R. 79, 83).  The ALJ accepted the VE's assessment that Plaintiff's past work as a document specialist was unskilled, light work and thus found that she remains capable of performing that job.  (R. 83).

In reaching this conclusion, the ALJ discussed Plaintiff's medical history— including her treatment history, her statements to her physicians and psychologists, and the medical source opinions—in detail.  (R.79-82).  The ALJ gave no weight to the March 2008 opinion of Dr. Lubenow that Plaintiff is "incapable of work," explaining that he did not identify any specific functional limitations Plaintiff's condition caused and that his assessment was unsupported.  (R. 82).  Instead, the ALJ gave significant weight to Dr. Bilinsky's assessment, as confirmed by Dr. Saulog, that Plaintiff was capable of light work, due to its overall consistency with the record and the lack of any other "contradictory functional findings."  (*Id.*).  As for Plaintiff's testimony of disabling pain, the ALJ found it to be disproportionate to the objective medical evidence in the record,

and that Plaintiff's conservative treatment history and ability to engage in a "full and normal range of activities of daily living" supported a finding that she was capable of light work, although the contrary testimony of Mr. Ragland and report of Ms. Ball had been given "due consideration." (R. 82-83).

**DISCUSSION**

**A.    Standard of Review**

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act. 42 U.S.C. § 405(g). That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion." *Thomas v. Colvin*, — F.3d —, 2014 WL 929150, at *1 (7th Cir. Mar. 11, 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir.2009)). An ALJ need not mention every piece of evidence in her opinion, as long as she does not ignore an entire line of evidence that is contrary to her conclusion. *Id.*, at *2 (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir.2012)). Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also id.* (the ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

**B.    Five-Step Inquiry**

To recover SSI under Title XVI of the Social Security Act, or DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability" as defined by the Act and regulations. *Infusino v. Colvin,* No. 12 C 3852, 2014 WL

266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, No. 10 C 6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A), 1382c(a)(3). *See also Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Simila*, 573 F.3d at 512-13 (quoting *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

## C.    Analysis

This Court discusses in turn each of Plaintiff's three arguments for reversing and remanding the ALJ's denial of benefits.

### 1.    The ALJ's Consideration of the Effects of Plaintiff's Depression and Gout on Her Limitations

Plaintiff argues that the ALJ erred in failing to factor the effects of her depression and gout into the RFC determination. (Doc. 18, at 13-14; Doc. 25, at 1-3). At Step 4, an ALJ is required to consider the aggregate effect of all impairments, including those the ALJ has determined are not severe. 20 C.F.R. § 404.1523; *see, e.g.*, *Castile v. Astrue,* 617 F.3d 923, 927 (7th Cir. 2010). However, any error by the ALJ in failing to mention one or more of a claimant's impairments or conditions when determining her

RFC is harmless if the claimant does not explain how her condition or impairment "aggravated her condition and rendered her disabled." *Mueller v. Colvin*, 524 F. App'x 282, 286 (7th Cir. 2013) (merely positing that plaintiff was obese and that obesity can affect a person's ability to stand, walk or stoop did not satisfy claimant's burden to show how obesity undermined her specific RFC determination).

At Step 2 the ALJ found that Plaintiff's gout was one of her severe impairments, explaining that there is physical evidence of "abnormalities which would affect [Plaintiff's] ability to do prolonged standing and walking." (R. 77). The ALJ also concluded that Plaintiff's depression is not a severe impairment, noting that there was no history of related treatment services but instead Plaintiff had treated her medical condition with Cymbalta. (R. 77-78). The ALJ also discussed Dr. Rudolph's assessment that despite exhibiting a depressed mood and limitations in "more advanced adaptive skills," Plaintiff was able to take care of her basic needs; was oriented; had intact memory skills; demonstrated good knowledge of general information; could perform arithmetic calculations; and was able to use judgment and reasoning skills. (R. 78). Overall, Dr. Rudolph opined that Plaintiff had no more than "mild" limitations in activities of daily living, social functioning, and concentration, persistence and pace. (*Id.*).

Plaintiff argues that the ALJ erred by failing to discuss the functional impact of her depression symptoms in the RFC analysis; specifically, depressed mood; limitations in performing more advanced adaptive skills; and mild limitations in social functioning and concentration, persistence and pace. (Doc. 25, at 2). As the ALJ discussed, Dr. Rudolph found in his October 9, 2008 examination that Plaintiff had good reasoning

skills and a good memory and was able to attend to her basic needs, and Dr. Boyenga found in his October 16, 2008 examination that Plaintiff's limitations in concentration, persistence and pace and social functioning were mild. (R. 77-79, 659-75). Dr. Merriman, the other clinical psychologist who examined Plaintiff, wrote in her January 17, 2008 report that Plaintiff "showed no signs of significant cognitive impairment or any disorganized thought process," but instead found she had an intact memory, concentration and judgment. (R. 451-53). Plaintiff does not point to any psychologists or physicians who indicated that her depression would affect her ability to perform light work. Indeed, there is no evidence that Plaintiff complained to the psychological examiners about any cognitive limitations. Nor did Plaintiff tell the ALJ at the hearing, when questioned about her depression and mental health, that it aggravated her condition or symptoms. (R. 54-55).

Plaintiff also argues that the ALJ failed to consider her gout symptoms at Step 4, and failed to acknowledge in the RFC determination that her gout "flare-ups" may impact her ability to work full-time, citing as support records allegedly showing she was "hospitalized on at least three occasions" for this condition. (Doc. 18, at 13-14; Doc. 25, at 3). The first "hospitalization" was Plaintiff's March 14, 2007 visit to Dr. Pietz, a podiatrist, who removed dead skin from Plaintiff's left fifth toe, recommended she wear comfortable shoes and suggested she return for further consultations, but whose report did not have any express discussion of gout and who it appears never saw Plaintiff again. (R. 317). The second "hospitalization" was Plaintiff's August 13, 2008 visit to the emergency room at Stroger due to pain in her first left toe, where Dr. Agarwala, the emergency room physician, noted Plaintiff had tissue swelling on her first left toe and

that Plaintiff told her a different physician had said she may have gout (although the record contains no such report), prescribed ibuprofen and gave her information on gout. (R. 652-64). Finally, the third "hospitalization" was Plaintiff's September 3, 2008 visit to the emergency room at Stroger, where she complained of pain in her right foot, and where the emergency room doctor opined her pain may be radiating to her foot from her back and suggested she see a neurologist (and where the doctor's report contains no discussion of gout). (R. 606).

Though the ALJ did not specifically use the term "gout" at Step 4 of the analysis or discuss issues with Plaintiff's left first toe and right foot, she did note that Plaintiff had "persistent complaints" of pain in her left baby toe and received related treatments. The ALJ also stressed that those treatments were conservative in nature and the record showed only minimal abnormal medical findings. (R. 80). In that regard, the ALJ noted that Plaintiff was able to walk on her toes and heels in May 2008; exhibited symmetrical ankle reflexes and showed no weakness with direct testing of the tibialis anterior and extensor hallucis longus—muscles which are responsible for extending and flexing the feet and ankles—in a September 2009 examination; and persistently demonstrated the functional ability to walk in examinations from August 2007 through October 2009.[25] (R. 81-82). On September 30, 2008, Dr. Saulog confirmed that Plaintiff is able to stand, walk or sit, with no postural limitations, for about six hours in an eight hour workday (with normal breaks), and neither Plaintiff nor her doctors identify any greater limitations resulting from her gout. (R. 82).

---

25 http://medical-dictionary.thefreedictionary.com/tibialis+anterior (last visited April 24, 2014); http://medical-dictionary.thefreedictionary.com/extensor+hallucis+longus (last visited April 24, 2014).

Nothing in the record suggests that Plaintiff's gout or depression caused Plaintiff any limitations or symptoms that the ALJ failed to address, much less that those symptoms preclude her from performing light work.  The ALJ's RFC determination is supported by substantial evidence and need not be reversed.

### 2.    The ALJ's Consideration of Medical Source Opinions.

Plaintiff argues that the ALJ did not give proper deference to statements from Drs. Lubenow and Pang that she is disabled and incapable of working.  (Doc. 18, at 14-15; Doc. 25, at 4).  Plaintiff concedes that neither opinion is entitled to controlling weight because the Commissioner is responsible for determining whether an individual is disabled.  (Doc. 25, at 3-4).  *See also* 20 C.F.R. § 404.1527(d); *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012) (Commissioner shall not give any special significance to statement by medical source that claimant cannot work); *Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1082 (N.D. Ill. 2011) ("[W]hether Claimant is 'disabled' is an administrative finding reserved for the Commissioner rather than a medical opinion."). With respect to Dr. Pang, moreover, the record reflects that he only examined Plaintiff one time and thus was not a "treating physician" as contemplated by the statute.  20 C.F.R. § 416.902; 20 C.F.R. § 404.1527(c)(2).  (*See also* Doc. 22, at 7; R. 598-602).

When an opinion is not given controlling weight, the ALJ must determine what weight it does merit considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."  *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see also Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).  Plaintiff claims that the doctors'

statements regarding disability should have received more weight because they were consistent with other substantial evidence of record, including her May 2007 MRI, her June 2007 radiographic examination from the chiropractor, October 2009 spinal x-rays, and the findings from multiple physical exams. (Doc. 18, at 14-15). The Court disagrees.

The ALJ discussed all of the cited diagnostic records, but found that they do not support greater limitations than those identified by Drs. Bilinsky and Saulog. As the ALJ noted, the May 2, 2007 MRI showed osteophytes at L5-S1 and, to a lesser degree, at L4-5, but there was only mild foraminal narrowing at L5-S1, and a May 21, 2007 EMG/NCV study was normal with no evidence of radiculopathy or neuropathy.[26]  (R. 81). As Plaintiff notes, in June 2007 her chiropractor filled out a checklist form entitled "Report of Radiographic Examination," checking boxes indicating findings of a loss of the normal anterior curve and a narrowing of certain weight bearing disc spaces. (Doc. 18, at 14-15; R. 360). It is not clear if the chiropractor conducted a separate diagnostic test here or if this form indicates his interpretation of the May 2007 imaging of Plaintiff's spine; regardless, these findings reveal the same issues that were reflected in the May 2, 2007 MRI that the ALJ expressly considered. *Compare* (R. 360) (June 2008 radiographic exam report), *with* (R. 342) (May 2007 MRI revealing mild straightening of lumbar spine and mild loss of disc height). And, x-rays taken more than two years later in October 2009 continued to show only mild to moderate narrowing at L5-S1, mild degenerative disc disease and very small osteophytes. (R.82). Multiple doctors (including Dr. Pang) reviewed the May 2007 MRI and EMG/NCV study and confirmed

---

26  The ALJ also wrote that the MRI revealed mild foraminal narrowing at L4-5. This appears to be a mistake that stems from quoting Dr. Slavick's description of the MRI, which contained the same error. *See supra* note 3 and accompanying text.

that Plaintiff was neurologically intact with no stenosis or radiculopathy. (R. 340, 376, 386, 430-31, 601, 721).

With respect to the physical examinations, the ALJ acknowledged that on several occasions between January 2008 and October 2009, Plaintiff exhibited an antalgic gait, positive straight leg raise tests, trigger points, pain, and decreased range of motion. (R. 81-82). The ALJ also observed, however, that during the same period, Plaintiff had only slight reduction in motor strength at 4/5 in January 2008, which improved to 5/5 in September 2009; she demonstrated functional strength for walking, tandem gait, and walking on her toes and heels; she had full range of motion in her hips; and her sensation, coordination and reflexes were all intact with no muscle wasting or atrophy. (*Id.*). Dr. Saulog and Dr. Bilinsky both agreed that Plaintiff remains capable of light work, and no other physician imposed any greater functional limitations. (R. 82).

Plaintiff objects that in affording the State agency opinions significant weight, the ALJ ignored a host of contrary evidence in the record, including her fibromyalgia diagnosis and positive Thomas tests.[27] (Doc. 18, at 15; Doc. 25, at 6). With respect to the fibromyalgia, the ALJ did not ignore the diagnosis but affirmatively stated that the two months of treatment Plaintiff received for that condition did not merit additional functional limitations.[28] (R. 83). Plaintiff stresses that fibromyalgia is characterized by pain and fatigue, but she does not point to any evidence indicating how the condition

_____

27 Plaintiff claims that the ALJ also failed to acknowledge her gout symptoms, slow and antalgic gait, positive straight leg raise tests, trigger points, and limited and painful range of motion, (Doc. 25, at 5-6), but as noted earlier, the ALJ considered and discussed all of these findings. (R. 80-82).

28 This finding appears to be based on Plaintiff's September 2009 statement to physicians at Stroger that she had received two months of treatment for fibromyalgia, but it had not been successful. (R. 721).

contributes to her particular symptoms or impacts her ability to work. Turning to the Thomas tests, while it is true that the ALJ did not specifically mention those positive results, it is also well-established that an ALJ need not address every piece of evidence in the record as long as she provides at least a glimpse into her reasoning. *E.g.*, *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) (citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)) (despite minor factual errors and omissions in opinion, ALJ's RFC determination upheld because it was supported by substantial evidence). Here, Plaintiff does not explain how the positive Thomas tests affect her functional abilities, much less contradicts the findings from Drs. Bilinsky and Saulog that the evidence of record demonstrates that she is capable of light work.

In her reply brief, Plaintiff argues in a cursory fashion that the ALJ could have gathered "more evidence" or clarification of the "reported clinical signs or laboratory findings" that may have provided "the requisite support" for the opinions from Drs. Pang and Lubenow. (Doc. 25, at 4-5). An ALJ has a duty to develop a full and fair record, and that duty is heightened where a claimant appears without counsel, as Plaintiff did here. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Nevertheless, courts generally defer to the "reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation." *Id.* (citing *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir.1994); *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir.1994)). As a result, a "significant" and "prejudicial" omission is usually required for finding that the ALJ failed to adequately assist a pro se claimant in developing the record, and "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Id.* (internal quotations and citations omitted).

"Instead a claimant must set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider." *Id.* (citing *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997); *Binion*, 13 F.3d at 245).

The hearing transcript shows that the ALJ asked Plaintiff about her medical records and requested that she supply any missing information. The ALJ then left the record open to receive treatment notes from Plaintiff's August 6, 2009 visit to Madison Family Medical Center, her September 4, 2009 IME report prepared by Dr. Zindrick, and the October 2, 2009 x-rays of Plaintiff's lumbosacral and cervical spine from Stroger. (R. 34-39). The ALJ expressly considered all of these records, as well as the findings from a post-hearing visit to the Stroger neurosurgery clinic on January 8, 2010. Plaintiff does not identify any additional evidence that the ALJ failed to examine or obtain, much less indicate how that evidence would support her claim of disability. And, unlike in the cases Plaintiff cites, there is not a large amount of illegible medical notes in this record that plainly required clarification, no missing report that the claimant requested be obtained that was not sought, nor any evidence that suggested a noticeable gap in the record of a history of hospitalization or treatment. *Contra Smith v. Sec'y of Health, Ed. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978); *Sears v. Bowen*, 840 F.2d 394, 396, 402 (7th Cir. 1988). As a result, the Court finds no cause for remanding this case for further development of the record.

In sum, the ALJ provided a thorough discussion of all the relevant medical evidence, and reasonably adopted uncontroverted functional limitations set forth by the State agency physicians. The ALJ's decision to afford no weight to the opinions from

Dr. Lubenow and Dr. Pang that Plaintiff is disabled is supported by substantial evidence and does not merit reversal.

### 3. The ALJ's Credibility Assessments.

Plaintiff argues that the ALJ also erred in finding that her claims of severe pain were not credible, and in rejecting or ignoring testimony from her supporting witnesses and her own statements to her physicians.  (Doc. 18, at 11-13; Doc. 25, at 6-8).  An ALJ's credibility determination must contain specific reasons for the credibility finding that are supported by evidence, but a court will overturn the determination only if "patently wrong."  *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013).  However, where the ALJ's credibility "determination rests on 'objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor],'" that deferential review is lessened.  *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *Craft*, 539 F.3d at 678 (same).

When determining the credibility of the claimant, the ALJ is required to consider the entire record, including the objective medical evidence of a claimant's impairments, her activities of daily living, her allegations of pain and aggravating factors, her functional limitations and her course of treatment.  *Schreiber*, 519 F. App'x at 960 (citing SSR 96-7p 1996 WL 374186, at *3; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)).  The ALJ should also consider the consistency of Plaintiff's testimony with the testimony of others regarding her daily activities, behavior and efforts to work.  *Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1009 (N.D. Ill. 2010) (citing SSR 96-7p, 1996 WL 374186, at *3).

The ALJ acknowledged Plaintiff's testimony that she has pain every day, all day; that her pain is in her lower back and radiates to her pelvic area as well as down to her right knee and left ankle; and that the pain becomes worse when she is sitting, standing or walking. (R. 79-80). The ALJ also noted that Plaintiff reported being able to walk for only 10-15 minutes; stand for 20-25 minutes if leaning against something; sit for 30 minutes; and lift about 5 pounds. (R. 80). In rejecting this testimony, the ALJ first concluded that Plaintiff's stated level of pain is "disproportionate to the objective findings," such as the 2007 MRI and EMG/NCV, and the 2009 x-rays. (R. 82). She also determined that Plaintiff's "consistently routine and conservative" treatment history supported discrediting Plaintiff's testimony. (*Id.*). With respect to Plaintiff's daily activities, the ALJ conceded that household chores "may take her longer to complete," she can only drive for short distances and "has to go with someone" to the store, (R. 78), but also emphasized that Plaintiff can take care of her personal grooming, prepare meals, cook, clean, and do laundry for herself and her son. (R. 83). In addition, the ALJ stated that Plaintiff can "do grocery shopping, light cleaning, dishes, dusting, and ironing while sitting"; "goes outside 2-3 days a week to walk or shop etc.;" walks alone; "can spend 4-6 hours at 5 different stores;" and listens to music, sings and reads. (R. 83).

Plaintiff argues that the ALJ failed to account for the fact that she performs many of these activities with restrictions. The Seventh Circuit has made it clear that a plaintiff's "ability to struggle through activities of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). This is particularly true if the activities "can be done only with significant

limitations." *Roddy*, 705 F.3d at 639;*see also Bjornson*, 671 F.3d at 647 (noting "critical differences between activities of daily living and activities in a full-time job."). Here, Plaintiff testified that she had to shower with a seat; does her chores in intervals with resting breaks; sometimes used a scooter while grocery shopping; only cooked quick meals and other people sometimes cooked for her; and only did light cleaning "when needed." (Doc. 18, at 11-12). The ALJ said nothing about these restrictions and then found Plaintiff generally "able to carry out a full and normal range of activities of daily living." (R. 83). From there, the ALJ stated that "[t]hese activities support the residual functional activity for light work." (*Id.*). Given the Seventh Circuit's admonition against "equating household chores to employment," particularly where someone struggles to do those activities, the Court finds that the ALJ gave undue weight to Plaintiff's activities of daily living in this case. *Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013).

Remand is also necessary in light of the ALJ's assertion that Plaintiff's "course of treatment over many years has been consistently routine and conservative . . ., consisting of pain management, medications, physical therapy, and epidural injections, rather than surgery or any other more drastic form of treatment." (R. 82). This ignores the record evidence that Plaintiff apparently underwent every other type of procedure available to her—including taking a variety of heavy medications such as Neurontin, OxyContin, Zanaflex and Vicodin, often in conjunction—and that she consistently told her physicians those treatments did not result in any lasting or significant relief from her pain. (Doc. 18, at 15; *see also* R. 436-37, 461, 467, 598-99, 601, 654). The ALJ did not discuss that Plaintiff tried to pursue a surgical option, but was told she was not a candidate. (R. 470, 540, 598-99). Under these facts, it is unclear how the ALJ

concluded from the treatment history that Plaintiff's complaints of severe pain were exaggerated. *Contra Leverance v. Astrue*, No. 09 C 559, 2010 WL 3386508, at *2 n.2 (E.D. Wis. Aug. 25, 2010) (noting that receipt of "conservative treatment" may be "more telling" when, for example, "a patient claims horrible pain but is told to use only aspirin.").

Moreover, the ALJ said that she gave "due consideration" to the testimony from Plaintiff's boyfriend, Mr. Ragland, and from her friend, Ms. Ball. (R. 83). Testimony of the boyfriend, as summarized by the ALJ, was that Plaintiff appeared to be in constant pain in the morning and while sitting; that she had "good days and bad days"; and that she used to be very active, but now lies down and sits for 30 to 60 minutes. (R. 80). Despite the fact that this was consistent with Plaintiff's complaints, the ALJ did not indicate what weight she gave that testimony. As for the friend's testimony, the ALJ did not address or weigh any of the statements. To the extent that the ALJ does not credit lay witness testimony regarding the intensity and persistence of Plaintiff's symptoms, including pain, the ALJ must "discuss the testimony specifically and make explicit credibility determinations." *Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *15 (N.D. Ill. Mar. 21, 2012) (citing *Behymer v. Apfel*, 45 F.Supp.2d 654, 663-64 (N.D. Ind. 1999)).

Because multiple aspects of the ALJ's credibility determination were flawed, the Court cannot accept the Commissioner's argument that any error here was harmless, and the case must be remanded for further consideration of these issues. *See Eakin v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2011) (remanding where ALJ discredited Plaintiff's testimony due to several "troubling" determinations).

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 18) is granted and the Commissioner's Motion for Summary Judgment (Doc. 21) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: April 29, 2013

SHEILA FINNEGAN
United States Magistrate Judge